IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| LOUIS RANIERI AND LOURDES RANIERI, | ) ) ) | CIVIL NO. 10-00295 JMS/KSC |
| Plaintiffs, | ) ) ) | ORDER GRANTING DEFENDANT RICHARD A. KERSENBROCK'S MOTION FOR SUMMARY |
| vs. | ) ) | JUDGMENT |
| RICHARD KERSENBROCK, ESQ., JOHN DOE DEFENDANTS 1-10, JANE DOE DEFENDANTS 1-10, RICHARD ROE PARTNERSHIPS 1-10, AND RICHARD ROE CORPORATIONS 1-10, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

## ORDER GRANTING DEFENDANT RICHARD A. KERSENBROCK'S MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

On January 12, 2009, Plaintiffs Louis Ranieri and Lourdes Ranieri

("Plaintiffs") filed this action alleging legal malpractice claims against their former

attorney, Richard Kersenbrock ("Defendant"), who represented them for five

months in 1997 to domesticate a Massachusetts Judgment Plaintiffs obtained

against Alan J. Palazini ("Palazini") and Alice Carol Lombardo ("Lombardo").

According to Plaintiffs, Defendant told them that he had obtained judgment liens

on several Hawaii condominiums, and was seeking to collect on these properties

when Plaintiffs replaced him with another attorney.  Defendant had not, however, obtained judgment liens on the condominiums and Plaintiffs ultimately stopped litigating their action seeking to collect on the condominiums, resulting in a dismissal with prejudice.

Currently before the court is Defendant's Motion for Summary Judgment, in which he argues, among other things,[1] that Plaintiff's claims are barred by the statute of limitations.  Based on the following, the court agrees and GRANTS Defendant's Motion for Summary Judgment.

## II.  <u>BACKGROUND</u>

### A.    **Factual Background**

In January 1997, Plaintiffs retained Defendant, who practiced with the law firm of Stubenberg & Durrett, to help them collect on a May 7, 1990 Massachusetts Judgment they received against Palazini and Lombardo in the amount of $600,000 plus interest at ten percent per annum.  Doc. No. 37-2, Def.'s Ex. A; Doc. No. 52-4, Lourdes Ranieri Decl. ¶ 2.  Plaintiffs had learned that Palazini and Lombardo held real property in Hawaii, specifically three "Pat's at Punaluu" condominiums, units BH109, BH216, and RPH5.  *See* Doc. No. 37-4,

---

[1]  Because the court agrees with Defendant's argument that Plaintiff's claims are barred by the statute of limitations, the court need not address Defendant's other summary judgment arguments.

2

Def.'s Ex. C at Interr. 2; Doc. No. 37-7, Def.'s Ex. F at 000004.  According to Plaintiffs, Defendant told them that he could domesticate the Massachusetts Judgment in Hawaii to enforce it against these Hawaii properties, and that a judgment lien on each of the properties would be effective for ten years and could be renewed for an additional ten years.  *See* Doc. No. 52-4, Ranieri Decl. ¶ 2. Plaintiffs therefore instructed Defendant to domesticate the judgment and record a judgment lien against each of the condominiums; Defendant subsequently reported to Plaintiffs that he had carried out these steps.  *Id.*

Defendant did not, however, create a judgment lien on the condominiums.  Indeed, a judgment lien could not simply be recorded on the condominiums -- the Massachusetts Judgment was against Lombardo and Palazini individually, while the condominiums were held by trusts such that the names on the Massachusetts Judgment compared to the names on the titles of the condominiums did not match.  These trusts, according to Plaintiffs, were created as shams to prevent Plaintiffs from reaching Lombardo and Palazini's assets. Plaintiffs' expert, A. Bernard Bays, asserts that Defendant could nonetheless have encumbered the condominiums by filing a petition with the Hawaii Land Court that "pointed out the judgment debtors' pattern of avoiding payment of the Judgment and alleged a violation of [Hawaii Revised Statutes ("HRS") Ch. 651C, Hawaii's]

Uniform Fraudulent Transfer Act." *See* Doc. No. 52-3, Pls.' Ex. A.[2] If successful,

the subsequent "notation of the Judgment on the [Transfer Certificate of Title

("TCT")] would have created a judgment lien on the [condominiums]." *Id.*; *see*

*also* Doc. No. 71-2, at 23-24 (explaining steps to encumber the condominiums).  In

comparison, Defendant's expert, Wayne Nasser, asserts that the Massachusetts

Judgment could not be filed in the Hawaii Land Court without first receiving a

separate court order allowing such filing.  *See* Doc. No. 37-32, Wayne Nasser

Decl. ¶ 14.

Although Defendant did not obtain judgment liens on the

condominiums, Defendant took other steps to encumber and/or collect on the

condominiums.  Specifically, on February 3, 1997, Defendant filed Special

Proceeding No. 97-0068 in the First Circuit Court of the State of Hawaii (the

"Special Proceeding") to domesticate the 1990 Massachusetts Judgment.  Doc. No.

37, Def.'s Concise Statement of Fact ("CSF") ¶ 2.[3]  In the Special Proceeding,

---

[2] In their Supplemental Reply, Defendant argues for the first time that Bays' expert opinion lacks foundation and should not be considered.  *See* Doc. No. 77, Def.'s Suppl. Reply at 3-4.  The court does not consider arguments raised for the first time in a Reply, much less a Supplemental Reply.

Defendant also raises a number of objections to Plaintiffs' facts and exhibits.  At the September 6, 2011 hearing, Defendant waived his objection that Plaintiffs' expert's report lacks authentication.  The court need not address Defendant's other objections as they do not ultimately affect the court's summary judgment analysis.

[3] Where the parties do not dispute a particular fact, the court cites directly to Defendant's
(continued...)

4

Defendant, among other things, received a Temporary Restraining Order on the condominiums, filed a Notice of Pendency of Action ("NOPA") in the Hawaii Bureau of Conveyances, and filed an ex parte motion for Writ of Possession.  Doc. Nos. 37-7, 37-8, 37-10, Def.'s Exs. F, G, I.

In April 1997, Defendant informed Plaintiff that he was leaving Stubenberg & Durrett, and in response, Plaintiffs notified Defendant that "effective immediately, we no longer want your office to represent us" in the Special Proceeding.  Doc. No. 37, Def.'s CSF ¶¶ 3-4.  As a result, on June 4, 1997, Plaintiffs retained John D. Marshall ("Marshall") to take over the Special Proceeding.  *Id.* ¶ 5.

On June 5, 1997, Marshall communicated his impressions regarding the Special Proceeding, questioning Defendant's course in domesticating the Massachusetts Judgment.  *Id.* ¶ 6.  Marshall explained to Plaintiffs that Defendant had filed the ex parte Motion for Writ of Possession pursuant to HRS § 666-11, which applies "to situations where a tenant has stopped paying a landlord" and did not appear applicable to these facts.  Doc. No. 37-14, Def.'s Ex. M at 00198-99.  Marshall explained:

---

[3](...continued)
CSF.

5

> Review of the full pleadings file confirms that a "writ of execution", which is the document that we need, was not applied for.
>
> It is apparent to me that [Stubenberg & Durrett] used HRS 666-11 to get a Writ of Possession, which wasn't what they really wanted -- and which I can't believe they got Judge Marie Milks to sign.
>
> It is also apparent to me that [Stubenberg & Durrett] were then going to try to use a Writ of Possession obtained under HRS 666-11 as a basis for advertisement and sale under 651-43 and 651-44.
>
> I don't think that it will work, and I have some thoughts about whether there are 'problems' to be made for you and/or [Stubenberg & Durrett] and/or the Court due to the manner in which the property was taken from them.
>
> I've taken a lot in in a short time, and I'll have to give it some thought; however, frankly, I'm going to be very careful about proceeding with any sale in this manner -- both for your protection and my own.

*Id.* at 00199.  Based upon this letter from Marshall, Plaintiffs understood that he was advising them that "he saw problems and action needing to be taken."  Doc. No. 52-4, Ranieri Decl. ¶ 3.  Plaintiffs therefore hired Marshall to take the necessary actions to collect on the condominiums.  *Id.*; *see also* Doc. No. 37-14, Def.'s Ex. M at 00199-200 (Marshall explaining that a Writ of Execution was necessary to collect on the condominiums).

From the beginning of his representation of Plaintiffs, Marshall

provided Plaintiffs detailed memoranda describing the legal issues their case

presented and the steps he was taking.  For example, in a July 31, 1997

memorandum, Marshall informed Plaintiffs that he had consulted with another

attorney with expertise on collections (David C. Farmer) regarding some "unusual

'gray hair' issues," including how to execute on the condominiums where there is

an issue of fact as to whether "Lombardo is in fact the true beneficial owner of the

Trust."  Doc. Nos. 73-2, Marshall Depo. Exs. 11, 12.

On August 12, 1997, Marshall informed Plaintiffs that he did not

believe it was "practical" to "to just 'execute' on [the condominiums]."  *Id.*

Marshall Depo. Ex. 13.  In response to Plaintiffs' question "regarding whether

there is a 'statute of limitation' or something which might result in our 'losing'

these properties," Marshall explained that "there is nothing specific like that," but

"given that the property is supposedly not presently held by a Judgment Debtor and

the issues regarding whether we're entitled to it, I'm always concerned about

someone . . . moving to jeopardize our 'hold' on the property . . . ."  *Id.*  Marshall

concluded that "as soon as I've heard back from Farmer I'll continue to grapple

with this difficult situation -- and settle upon some plan of attack."  *Id.*  In a

September 2, 1997 memorandum, Marshall explained that he was still "wrestling

with the legal issues relating to <u>how</u> to go about getting satisfaction from the

Punaluu condos, including figuring out how the 1994 Hawaii Supreme Court case of <u>Tanaka v. Nagata</u>[4] (enclosed) affects us, as well as how the Uniform Fraudulent Transfer Act does)."  *Id.* at Marshall Depo. Ex. 15.

In a September 10, 1997 memorandum, Marshall offered a possible course of action of filing a separate action in Hawaii Circuit Court against Lombardo, the trusts, and their beneficiaries for fraudulent conveyance, constructive trust, and declaratory judgment.  *Id.* at Marshall Depo. Ex. 16. Marshall explained that during the pendency of such action, "we might lose our grip" on the condominiums, but there were several options to prevent the condominiums' transfer to third parties, including seeking a writ of attachment, an injunction, and/or lis pendens.  *Id.*  As to the lis pendens, Marshall told Plaintiffs that it "will scare off legitimate buyers/transferees, and it might help us recover the property from any persons to whom the property is transferred to, if for any reason Lombardo is able to do that at some future time."  *Id.*  Marshall did not believe, however, they could simply "'execute' on the properties, by way of filing and winning some kind of a motion, within the existing Special Proceeding," but was

---

[4] *Tanaka v. Nagata*, 76 Haw. 32, 36, 868 P.2d 450, 454 (1994), held that "a transferee who retains title to the subject property or who claims an interest in the property or its proceeds . . . is a necessary party to any action seeking to set aside the transfer.  Such an action for relief against a transfer alleged to be fraudulent should be brought pursuant to [HRS Ch. 651C, Hawaii's Uniform Fraudulent Transfer Act]."

willing to discuss whether Plaintiffs could convince him to attempt such steps. *Id.*

Plaintiffs ultimately agreed that the best course of action was to file a civil action -- on September 23, 1997, Marshall filed a complaint to collect on the condominiums in the First Circuit Court of the State of Hawaii on behalf of Plaintiffs against Lombardo, the trusts in which title to the condominiums were held, and the beneficiary of the trusts, Lombardo's mother Alice Jean McDermott ("McDermott"). *See* Doc. No. 37-17, Def.'s Ex. P (listing as Defendants Lombardo, "individually and in her alleged capacity as trustee of the trusts named herein; BCR Realty Trust; Keanuenue Realty Trust; and the Mele Ka Kai Realty Trust; Alice Jean McDermott; [and] Beachcomber Realty, Inc.").[5] The purpose of this action, Civil No. 97-3913-09 (the "Civil Action"), was to execute upon the three condominium units and/or obtain injunctive, equitable, declaratory and other relief against these Defendants. Doc. No. 37, Def.'s CSF ¶ 8. Specifically, the Complaint asserted fraudulent transfer claims pursuant to common law and statute (HRS Ch. 651C, Hawaii's Uniform Fraudulent Transfer Act) on the basis that the trusts were shams created to evade Plaintiffs' efforts to collect on the Massachusetts Judgment and that Lombardo was the beneficial owner of the three condominiums such that Plaintiffs are entitled to execute upon them. Doc. No. 37-

---

[5] By this time, Palazini had passed away.

17, Def.'s Ex. P.  The parties do not dispute that the Civil Action was an appropriate mechanism to encumber and collect upon the condominiums.  *See* Doc. No. 55-2, Def.'s Ex. EE at 43.

In October 1997, Marshall recorded NOPAs in both the Hawaii Land Court and the Hawaii Bureau of Conveyances, giving notice pursuant to HRS § 634-5 of the pendency of Plaintiffs' Civil Action and that the action sought to affect title and/or the right of possession of the condominiums.  *Id.* ¶¶ 9, 10.

On June 12, 1998, Plaintiffs were served with a lawsuit, titled *Henson et al. v. Alice Carol Lombardo, Trustee of B.C.R. Realty Trust; Louis Ranieri; Lourdes Ranieri, et al.*, Civil No. 98-1618-04, filed in the First Circuit Court of the State of Hawaii (the "Henson Action").  *Id.* ¶ 11.  The Henson Action plaintiffs had sold condominium unit BH109 to Lombardo and Palazini in trust, and were mortgagees of BH109.  No. 37-21, Def.'s Ex. T.  The Henson Action plaintiffs brought the Henson Action seeking to foreclose after Lombardo's and Palazini's trust failed to timely pay the mortgage.  *Id.*  Plaintiffs decided not to contest the Henson Action based on their understanding that the Henson Action plaintiffs had a superior claim to this condominium.  Doc. No. 52-4, Ranieri Decl. ¶ 4.  Plaintiffs did not, however, understand that the Henson Action indicated that their Massachusetts Judgment was not recorded against the condominium units.  *Id.*

10

Default was entered against Plaintiffs for nonappearance, and judgment was entered against all the defendants on June 21, 2001, giving the Hensons the right to foreclose on one of the condominium units.  Doc. No. 37, Def.'s CSF ¶ 11.

In the meantime, on July 28, 1999, Marshall withdrew as counsel for Plaintiffs in both Plaintiffs' Special Proceeding and Civil Action due to financial reasons (Plaintiffs failed to pay him).  *Id.* ¶ 12; *see also* Doc. No. 37-4, Def.'s Ex. C at Interr. 12.  From this point forward, Plaintiffs proceeded pro se in both the Special Proceeding and the Civil Action.  Doc. No. 37, Def.'s CSF ¶ 14.  On May 15, 2001, the First Circuit Court dismissed Plaintiffs' Civil Action with prejudice for inactivity.  *Id.* ¶ 13.  According to Plaintiffs, they "understood that the judgment had been exemplified and recorded [such that] this lawsuit had served its purpose and no longer was of concern."  Doc. No. 52-4, Ranieri Decl. ¶ 5.  Plaintiffs nonetheless attempted to consult with a Hawaii attorney, but were not successful in finding an attorney to represent them in the time needed to set aside the dismissal.  *Id.* ¶ 6.

According to Plaintiffs, the first time they received any indication that Defendant had not obtained a ten-year judgment lien against each condominium was in June 2006, when they received a telephone call from an individual who had purchased unit RPH-5 in 2004.  Doc. No. 52-4, Ranieri Decl. ¶ 7.  Upon learning

this information, Plaintiffs contacted Defendant, who told them that someone could not have purchased any of the condominiums because he had "attached and recorded them myself." *Id.* ¶ 9.  Plaintiffs subsequently retained attorney Phil Leas to renew and/or extend their judgment in Hawaii for an additional ten years, based on the belief that Defendant had domesticated the Massachusetts Judgment and that it was valid for ten years.  *Id.* ¶ 10.  Leas reported to Plaintiffs that contrary to their understanding, the domesticated judgment was not recorded in Hawaii Land Court, meaning that the remaining two condominiums could be and were sold without Plaintiffs' knowledge.  *Id.*

On February 7, 2007, Plaintiffs filed an action against Lombardo's mother, Alice McDermott (the "McDermott Action").  The Complaint asserted that Plaintiffs obtained the Massachusetts Judgment against Lombardo and Palazini, and that Lombardo transferred one of the condominiums (RPH-5) to McDermott on June 28, 2004, who then sold the condominium to a third party.  Doc. No. 37-29, Def.'s Ex. BB.  The Complaint further asserted that the transfer from Lombardo to McDermott violates HRS Ch. 651C and asked that McDermott turn over the amount she received for the condominium when sold to the third party.  *Id.* ¶¶ 18-28.  On July 21, 2009, McDermott, relying on the May 15, 2001 dismissal with prejudice of Plaintiffs' Civil Action, obtained summary judgment

on the basis that the action was barred by *res judicata.  Id.* ¶ 15.

## B.    Procedural Background

On February 10, 2010, Plaintiffs filed this action in the First Circuit Court of the State of Hawaii alleging claims against Defendant for negligence and gross negligence regarding his representation of Plaintiffs in 1997.  On May 19, 2010, Defendant removed the action to this court.

Defendant filed his Motion for Summary Judgment on June 15, 2011, and a Supplemental Memorandum on July 27, 2011.  Plaintiffs filed their Opposition on August 16, 2011, and Defendant filed his Reply on August 24, 2011.  A hearing was held on September 6, 2011.  On September 7, 2011, the court requested further briefing from the parties "as to the applicability of claim and/or issue preclusion relating to the May 15, 2001 dismissal with prejudice of [the Civil Action]."  Doc. No. 59.  On October 17, 2011, the parties submitted Supplemental Briefs,[6] and on October 31, 2011, the parties submitted Supplemental Replies.  On

---

[6]  The court's request for supplemental briefing was limited to what was requested in its September 7, 2011 Order Requiring Further Briefing from the Parties Regarding (1) Causation and (2) Judgment Lien Procedure.  Doc. No. 59.  Defendant also presented additional evidence in support of his statute of limitations argument, which he obtained after the September 6, 2011 hearing.  Because Plaintiffs had an opportunity to respond and indeed addressed Defendant's statute of limitations argument in their supplemental briefing, the court considers these supplemental arguments and evidence.

13

November 2, 2011, Plaintiffs submitted a Sur-Rebuttal.[7]

### III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward

---

[7] On November 2, 2011, Plaintiffs filed a Motion for Leave to File a Sur-Rebuttal Brief, and Defendant filed an Opposition on November 11, 2011.  The court GRANTS Plaintiffs' Motion and considers the Sur-Rebuttal Brief in determining Defendant's Motion for Summary Judgment.

14

with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor" (citations omitted)).

## IV.  **DISCUSSION**

The statute of limitations for legal malpractice claims is governed by HRS § 657-1, which provides that such actions "shall be commenced within six years next after the cause of action accrued, and not after." *See also Blair v. Ing*,

95 Haw. 247, 264 n.12, 21 P.3d 452, 469 n.12 (2001).

On its face, Plaintiffs' claims appear to be time-barred.  Plaintiffs assert that Defendant breached his duty to them by failing to obtain judgment liens on the condominiums as he told them he had, *see* Doc. No. 1-2, Compl. ¶ 7, and this alleged failure on Defendant's part occurred in 1997.  Plaintiffs brought this action on February 10, 2010 -- over twelve years after Defendant represented them and they replaced him with Marshall.  Plaintiffs nonetheless argue that their claims did not accrue -- and the statute of limitations did not begin to run -- until Plaintiffs learned that Defendant failed to obtain a judgment lien on the condominiums in 2006.

Plaintiffs seek benefit of the discovery rule, which applies to legal malpractice claims.  *See Blair*, 95 Haw. at 267, 21 P.3d at 472.  Under the discovery rule, "a . . . claim accrues when the plaintiff discovers, or through the use of reasonable diligence should have discovered[,]" the cause of action.  *Ass'n of Apartment Owners of Newton Meadows ex. rel. its Bd. of Dirs. v. Venture 15, Inc.*, 115 Haw. 232, 270, 167 P.3d 225, 277 (2007) (applying discovery rule under HRS § 657-7); *Blair*, 95 Haw. at 267, 21 P.3d at 472 (stating accrual began when plaintiff knew or should have known of claim); *Buck v. Miles*, 89 Haw. 244, 251, 971 P.2d 717, 724 (1999) (stating that "under the discovery rule, the statute of

16

limitations begins to run the moment the plaintiff discovers or should have

discovered the negligent act, the damage, and the causal connection between the

former and the latter" (citation, quotation signals, and brackets omitted)); *see also*

*Hays v. City & Cnty. of Honolulu*, 81 Haw. 391, 398, 917 P.2d 718, 725 (1996)

(holding that the statute of limitations does not begin to run until Plaintiffs "have

knowledge of those *facts* which are necessary for an actionable claim before the

statute begins to run" (internal citations omitted)).

The discovery rule does not place the burden on a plaintiff of learning

every discoverable fact; rather, the relevant question is whether the plaintiff knew

of facts that would cause a reasonable individual to perform a further inquiry.

*Vidinha v. Miyaki*, 112 Haw. App. 336, 341, 145 P.3d 879, 884 (2006), explains:

> As the discovery rule has developed, the salient point
> giving rise to its application is the inability of the injured,
> despite the exercise of reasonable diligence, to know that
> he is injured and by what cause. We have clarified that
> in this context, reasonable diligence is not an absolute
> standard, but is what is expected from a party who has
> been given reason to inform himself of the fact upon
> which his right to recovery is premised. As we have
> stated: "[T]here are [very] few facts which diligence
> cannot discover, but there must be some reason to
> awaken inquiry and direct diligence in the channel in
> which it would be successful. This is what is meant by
> reasonable diligence." Put another way, "[t]he question
> in any given case is not, what did the plaintiff know of
> the injury done him? [B]ut, what might he have known,
> by the use of the means of information within his reach,

> with the vigilance the law requires of him?"  While
> reasonable diligence is an objective test, "[i]t is
> sufficiently flexible . . . to take into account the
> difference[s] between persons and their capacity to meet
> certain situations and the circumstances confronting them
> at the time in question."  Under this test, a party's actions
> are evaluated to determine whether he exhibited "those
> qualities of attention, knowledge, intelligence and
> judgment which society requires of its members for the
> protection of their own interest and the interest of
> others."

(quoting *Fine v. Checcio*, 870 A.2d 850, 858 (Pa. 2005)); *see also Venture 15, Inc.*, 115 Haw. at 271, 167 P.3d at 278.  Reasonable diligence "means simply that an injured party must act with some promptness where the facts and circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist."  *Venture 15, Inc.*, 115 Haw. at 270, 167 P.3d at 277 (citation, quotation signals, and brackets omitted).

Although determining the date that a plaintiff knew or should have known of her claims is generally a question for the jury, *Blair*, 95 Haw. at 267, 21 P.3d at 472, when viewed in a light most favorable to Plaintiffs, the evidence supports only one conclusion -- that Plaintiffs should have discovered that Defendant failed to obtain judgment liens on the condominiums in 1997 when Marshall took over representing them and filed the Civil Action.

18

Specifically, if Defendant had actually been successful in obtaining judgment liens on the condominiums, then Plaintiffs, by definition, would have a lien binding each condominium in favor of Plaintiffs, giving them the right to levy on the condominiums to satisfy the Massachusetts Judgment. *See Matter of 2003 & 2007 Ala Wai Blvd., City & County of Honolulu*, 85 Haw. 398, 410, 944 P.2d 1341, 1353 (Haw. App. 1997), *overruled on other grounds by Knauer v. Foote*, 101 Haw. 81, 85-89, 63 P.3d 389, 393-97 (2003) (quoting the *Black's Law Dictionary* (6th ed. 1990), definition of "judgment lien" as "[a] lien binding the real estate of a judgment debtor, in favor of the holder of the judgment, and giving the latter a right to levy on the property for the satisfaction of his judgment to the exclusion of other adverse interests subsequent to the judgment"); *Nichols v. Wah Chong Sun*, 28 Haw. 395, 398 (Haw. Terr. 1925) (providing similar definition); *see also* HRS § 501-102 (describing that a judgment lien is "notice to all persons from the time of such registering, filing, recording, or entering . . ."); HRS § 636-3 (describing when a judgment lien may be obtained); Hawaii Land Court Rule 62(e).

But from their discussions with Marshall, Plaintiffs had to have known that Defendant did not obtain judgment liens on the condominiums -- Marshall did not propose that they could simply seek to levy on the condominiums

19

to satisfy the Massachusetts Judgment.  *See, e.g.*, HRS § 651-32 (describing that the district court may execute a judgment "against the property of the party recovered against").  Rather, Marshall told them -- in several different memoranda -- that they could *not* execute on the condominiums due to the complexities of their case, including that the condominiums were held in trust and there was a fact question whether Lombardo was indeed the beneficial owner.  *See* Doc. No. 73-2, Marshall Depo. Ex. 12 (describing that Plaintiffs' case presented some  "unusual 'gray hair' issues," including how to execute on the condominiums where there is an issue of fact as to whether "Lombardo is in fact the true beneficial owner of the Trust"); *id.* Marshall Depo. Ex. 13 (explaining his belief that it was "practical" to "to just 'execute' on [the condominiums]"); *id.* Marshall Depo. Ex. 15 (telling Plaintiffs that he was "wrestling with the legal issues relating to <u>how</u> to go about getting satisfaction from the Punaluu condos"); *id.* Marshall Depo. Ex. 16 (reiterating his belief that they could not simply "'execute' on the properties, by way of filing and winning some kind of a motion, within the existing Special Proceeding").

Also contrary to Plaintiffs' asserted belief that Defendant had obtained judgment liens on the condominiums is that Marshall explained to Plaintiffs that he needed to take certain steps to ensure that condominiums were not

transferred to third parties.  For example, Plaintiffs specifically asked Marshall

"regarding whether there is a 'statute of limitation' or something which might

result in our 'losing' these properties," and Marshall explained that "there is

nothing specific like that," but "given that the property is supposedly not presently

held by a Judgment Debtor and the issues regarding whether we're entitled to it,

I'm always concerned about someone . . . moving to jeopardize our 'hold' on the

property . . . ."  *Id.* Marshall Depo. Ex. 13.  Further, in proposing that they file the

Civil Action, Marshall explained that "we might lose our grip" on the

condominiums, but had available several options to protect the condominiums

from transfer, including seeking a writ of attachment, an injunction, and/or lis

pendens.  *Id.* Marshall Depo. Ex. 16.  Marshall specifically told Plaintiffs that a lis

pendens "will scare off legitimate buyers/transferees, and it might help us recover

the property from any persons to whom the property is transferred to, if for any

reason Lombardo is able to do that at some future time."  *Id.*

Although Plaintiffs are lay people and thus may not understand the

full legal import of a "judgment lien," Plaintiffs had an understanding that a

judgment lien would be valid on each of the condominiums for ten years and

would prevent the condominiums from being transferred to third parties.  *See* Doc.

No. 52-4, Ranieri Decl. ¶¶ 2, 7, 9.  But Marshall provided them information that

directly contradicted that understanding, including that: (1) there were fact issues regarding whether Lombardo was truly the beneficial owner of the condominiums, preventing Plaintiffs from simply executing on them; (2) Plaintiffs needed to take certain steps to ensure that the condominiums were not transferred to third parties; and (3) the filing of a Civil Action, seeking to declare Lombardo the beneficial owner of the condominiums such that Plaintiffs are entitled to execute upon them, was the best course of action.  Indeed, Plaintiffs agreed with Marshall to file the Civil Action, yet Plaintiffs and Defendant agree that the Civil Action would have been unnecessary had Defendant obtained judgment liens on the condominiums. For example, Plaintiffs assert that "had Defendant Kersenbrock succeeded in obtaining a judgment lien, there would have been no Civil No. 97-3913-09, for that action was filed by Mr. Marshall only as an alternative means for obtaining relief against Lombardo and Palazini in their trustee capacities." *See* Doc. No. 71, Pls.' Suppl. Br. at 10.  Defendant's expert Nasser asserts that "[i]f the [Massachusetts Judgment] had been record in the Land Court, [Marshall would simply have gone straight to collection." Doc. No. 73-5, Def.'s Ex. 3.  At the very least, this information from Marshall put Plaintiffs on notice that they needed to perform a further inquiry to determine whether Defendant had in fact obtained a judgment lien on the condominiums.  *See Vidinha*, 112 Haw. App. at 341, 145 P.3d at 884.

Thus, Plaintiffs should have known that (or at the very least should have inquired whether) Defendant failed to create judgment liens on the condominiums by the time the Civil Action was filed.

In opposition, Plaintiffs argue that Marshall's communications with Plaintiffs did not put them on notice of their claims against Defendant because the memoranda also included demands for payment such that Plaintiffs "would give less attention to, or even dismiss, the accompanying status reports on the litigation." Doc. No. 76, Pls.' Suppl. Reply at 3. The court easily rejects this argument -- although Marshall's memoranda each included a section outlining charges to date and the need for payment, the first portion of each memorandum was focused on describing the legal issues and possible steps forward. These memoranda further reflect that Marshall and Plaintiffs had on-going discussions regarding the legal issues. *See, e.g.*, Doc. No. 73-2, Marshall Depo. Ex. 13 (responding to a question by Plaintiffs). That these memoranda also requested payment does not lessen the impact of the information contained in them.

In sum, the court finds that Marshall's communications with Plaintiffs would have put a person of common knowledge and experience as Plaintiffs on notice that Defendant had not carried out the steps he told Plaintiffs he had done. In other words, Marshall's communications provided Plaintiffs with information

23

that would cause a reasonable individual to inquire whether Defendant had actually obtained judgment liens on the condominiums.  Thus, with the exercise of reasonable diligence, Plaintiffs certainly should have learned that there were no judgment liens on the condominiums in 1997.

Although not necessary to the court's determination that Plaintiffs should have learned through the exercise of due diligence that Defendant failed to obtain judgment liens on the condominiums, the court also finds in the alternative that Plaintiffs had constructive knowledge that Defendant had not obtained judgment liens in 1997 --- the knowledge of an individual's attorney (Marshall) is imputed to his clients (Plaintiffs).  *See Medeiros v. Udell*, 34 Haw. 632, 1938 WL 6814, at *2 (Haw. Terr. 1938) ("Knowledge on the part of an attorney is imputable to his client."); *see also Immunocept, LLC v. Fulbright & Jaworski, LLP*, 504 F.3d 1281, 1287 (Fed. Cir. 2007) ("Knowledge or notice to an attorney acquired during the existence of the relationship of attorney and client, and while acting within the scope of his authority, is imputed to the client." (citation and quotation signals omitted)); *Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994) ("'[A client] has notice of a fact if his [attorney] has knowledge of the fact, reason to know it or should know it, or has been given a notification of it.'" (quoting Restatement (Second) of Agency § 9(3) (1958))); *Levin v. Berley*, 728 F.2d 551, 553 (1st Cir. 1984) ("Levin

24

denies knowledge of this letter, but a client is charged with the knowledge of his

attorney.").

       Except for two irrelevant exceptions,[8] the Restatement (Third) of

Agency further explains that an attorney's knowledge is imputed to the client for

purposes of applying the discovery rule:

> *Legal consequences -- timeliness of action*.  Knowledge
> of a fact or reason to know it may determine whether a
> person has asserted a claim in timely fashion by bringing
> suit because knowing the fact or having reason to know it
> determines when the applicable statute of limitations
> begins to run. . . .  Facts that an agent knows or has
> reason to know may thus determine whether the principal
> has acted in timely fashion.

Restatement (Third) of Agency, § 5.03 cmt. d(5) (2006).[9]  In other words, "the

statute of limitations on a client's action will begin to run when the client's

---

[8]  As to the exceptions, the Restatement (Third) of Agency, § 5.03 (2006), explains that notice between a principal and agent may not exist where the agent acts adversely to the principal or where the agent is subject to a duty to another not to disclose the fact to the principal.  No such facts exist here.

[9]  Although the Restatement (Third) of Agency is relatively new (published in 2006), Hawaii courts have relied upon some of its provisions, *see, e.g.*, *Murphy v. Lovin*, --- P.3d ----, 2011 WL 5127797, at *10 (Haw. App. Oct. 28, 2011), and Hawaii courts have previously relied on the Restatement (Second) of Agency for guidance.  *See, e.g.*, *Kaopuiki v. Kealoha*, 104 Haw. 241, 251-52, 87 P.3d 910, 920-21 (Haw. App. 2003); *Wong-Leong v. Haw. Indep. Refinery, Inc*. 76 Haw. 433, 438, 879 P.2d 538, 544 (1994).  Given that the Restatement (Third) of Agency simply elaborates on an established principle of law that Hawaii follows (*i.e.*, that notice to an agent is imputed to the principal, *see Medeiros v. Udell*, 34 Haw. 632, 1938 WL 6814, at *2 (Haw. Terr. 1938)), the court finds that the Hawaii Supreme Court would find these provisions instructive.

attorney knew or should have known about the circumstances giving rise to that claim, even if the client lacks knowledge of the potential claim." *Arlington Funding Servs. v. Geigel*, 2009 WL 357944, at *6-7 (D. V.I. Feb. 9, 2009); *see also Veal*, 23 F.3d at 725 (concluding that appellant's civil rights action was time-barred because counsel's knowledge of a tainted line-up was imputed to the client despite client's lack of actual knowledge).

Applying these principles, in taking over Plaintiffs' case from Defendant, Marshall had a duty to determine what steps Defendant had taken and determine how best to proceed.  Marshall must have known that Defendant did not obtain judgment liens on the condominiums -- Marshall had reviewed Defendant's file, *see* Doc. No. 37-14, Def.'s Ex. M at 00198; reviewed the title records, *see* Doc. No. 73-2, Def.'s Ex. GG, Marshall Depo. Ex. at 18 (stating that he "went thru the Island Title records"); proposed steps to protect the condominiums from transfer that would not have been needed had Defendant obtained a judgment lien (described above), and ultimately decided to file the Civil Action, an unnecessary action if Defendant obtained judgment liens on the condominiums.[10]  *See* Doc. No.

---

[10]  Plaintiffs do not allege that Defendant should have obtained some type of lesser encumbrance on the condominiums, and in any event, such claim would fail as barred by claim preclusion.  Specifically, if Plaintiffs asserted that Defendant should have simply noted the existence of the Massachusetts Judgment on the TCT for the condominiums, Plaintiffs would still be presented with the issue that the Massachusetts Judgment is in the name of Lombardo and

(continued...)

71, Pls.' Suppl. Br. at 10; Doc. No. 73-5, Def.'s Ex. 3.  This knowledge is imputed to Plaintiffs, which means that the statute of limitations for their claims against Defendant began to run in 1997.

In sum, there is no genuine issue of material fact that Plaintiffs knew and/or should have known -- whether through their own duty to inquire triggered from Marshall's memoranda, or through Marshall's knowledge imputed to them -- that Defendant had not obtained judgment liens on the condominiums by 1997 when the Civil Action was filed.  Plaintiffs' claims against Defendant are therefore time-barred.

## V.  **CONCLUSION**

Based on the above, the court GRANTS Defendant's Motion for

---

[10](...continued)
Palazini and the condominiums are held in the name of the trusts.  Thus, to collect on the Massachusetts Judgment, the Civil Action would still be necessary to establish that Palazini and Lombardo had fraudulently transferred the condominiums to the trusts and to allow Plaintiffs to execute on the condominiums.  The Civil Action, however, was dismissed with prejudice for lack of prosecution, which bars Plaintiffs from ever asserting claims against Lombardo, McDermott, or the trusts for fraudulent transfer -- the Civil Action was a final judgment on the merits, Plaintiffs would need to assert claims in a subsequent action against Lombardo and the trusts, *see Tanaka v. Nagata*, 76 Haw. 32, 36, 868 P.2d 450, 454 (1994) (providing that the transferees are necessary parties to a fraudulent transfer claim), and the claims in both actions would be the same.  *See Bremer v. Weeks*, 104 Haw. 43, 54, 85 P.3d 150, 161 (2004) (stating that claim preclusion applies where "(1) there was a final judgment on the merits, (2) both parties are the same or in privity with the parties in the original suit, and (3) the claim decided in the original suit is identical with the one presented in the action in question").

Summary Judgment.  The Clerk of Court is directed to close the case file.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, November 10, 2011.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Ranieri et al. v. Kersenbrock*, Civ. No. 10-00295 JMS/KSC, Order Granting Defendant Richard A. Kersenbrock's Motion for Summary Judgment